```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION

Dakeyla N. Mills,                  :

        Plaintiff,                 :

    v.                             :     Case No.  2:16-cv-45

                                   :     JUDGE JAMES L. GRAHAM
Commissioner of Social Security,         Magistrate Judge Kemp

        Defendant.                 :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Dakeyla N. Mills, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Those applications were filed on August 14, 2012, and alleged that Plaintiff became disabled on June 5, 2009.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on November 5, 2014. In a decision dated December 22, 2014, the ALJ denied benefits. That became the Commissioner's final decision on November 23, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on March 29, 2016. Plaintiff filed a statement of specific errors on May 13, 2016, to which the Commissioner responded on August 25, 2016. Plaintiff filed a reply brief on September 8, 2016, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 36 years old as of the date of the hearing and who has a ninth grade education, testified as

follows.  Her testimony appears at pages 39-66 of the administrative record.

Plaintiff was first asked about her past work.  She had held part-time jobs as a dietary aide, at a Golden Corral restaurant, and at Taco Bell.  She hurt her back in 2009, which is why she alleged a disability since that date.  She did work part-time afterwards, but stopped working completely in 2012 because her back got worse.

Plaintiff described her back pain as starting in the middle of her lower back and then radiating to one side or the other.  She had been treated for back pain since 2009, which treatment included injections and medications.  Her most recent prescription was for Percocet.  It helped take the edge off the pain.  Steroid injections helped relieve the pain temporarily but it always returned.  Physical therapy had not helped her.  She also had a TENS unit and it helped a little.

As far as activity was concerned, Plaintiff said that both standing and sitting made the pain worse.  She also testified to having migraine headaches as often as three times per week.

### III.  The Medical Records

The pertinent medical records are found beginning at page 291 of the record.  They can be accurately summarized as follows.

Plaintiff reported back pain to her doctor as early as August 26, 2009.  At that time, it was described as SI join pain radiating down the right side.  Plaintiff had apparently sought chiropractic treatment for several months with no relief, and had also been seen in the emergency room the day after she was injured (Tr. 313).  She was prescribed pain medication and referred for pain management. (Tr. 291-96).  She also underwent physical therapy with a goal of reducing the pain she experienced with activity.  She was discharged from therapy on November 17, 2009, with her goals not met secondary to poor attendance.  (Tr.

297-307). She went back to the emergency room in April, 2010, with an exacerbation of her back pain, which had not improved despite injections, and was discharged with medication. (Tr. 322-24).

An MRI study of the low back was done on January 19, 2012. It showed fact joint hypertrophy at L3-4 and L4-5 without stenosis and no disk herniations. (Tr. 359).

Plaintiff was seen at Genesis Pain Management in Zanesville from November, 2009 through August, 2012. Her doctor reported on September 5, 2012 that she had low back and buttock pain with tenderness over the sacroiliac joints and coccyx, and also with radicular symptoms into the buttock and posterior thigh intermittently. Dr. Siefert's notes from that practice show that Plaintiff complained of headaches as well as back pain, and that she had been treated with injections with some relief. She had good motor strength and could get on and off the exam table without difficulty. She was on medications including Naproxen, Flexeril, and Percocet. Plaintiff exhibited tenderness over the SI joints. Because the injections provided only temporary relief, Dr. Siefert discussed radiofrequency ablation with her but she did not opt for that treatment. Standing and prolonged sitting made her pain worse, and she used Percocet at night to help her sleep. (Tr. 359-418). Records from later in 2012 and from early 2013 are similar, and she continued to have injections. Dr. Siefert completed a form on February 25, 2013, stating that due to pain, Plaintiff had marked restriction in her activities of daily living and that her pain ranged from moderate to severe. (Tr. 466). Plaintiff had more injections in 2014.

Plaintiff underwent a psychological evaluation which was conducted on December 6, 2012, by Floyd Sours, a consulting psychologist. Plaintiff reported depression but said she had never sought treatment. She also described constant low back

pain and said she could not walk, stand, or sit for long.  At that time, she was working part-time but on a reduced schedule due to back pain.  During the evaluation, she exhibited a minimal range of emotion and said she had had chest pain which might be anxiety, but did not consider it to be much of a problem.  Based on the interview, Mr. Sours concluded that Plaintiff was functioning in the borderline range, with less than marginal insight and at least marginal judgment.  Plaintiff said she was able to take care of her personal and family needs and to go to her job, to watch television, and to socialize with her family. Mr. Sours diagnosed PTSD, an adjustment disorder with depressed mood, and borderline intellect, and rated Plaintiff's GAF at 65. Mr. Sours thought Plaintiff could understand, remember, and carry out instructions in a work setting, could attend to simple, repetitive tasks and even multi-step tasks, and could relate to others and maintain appropriate behavior under work pressure. (Tr. 419-24).

Plaintiff's records were also reviewed at the state agency level.  On the physical side, Dr. Klyop expressed the opinion that Plaintiff could do light work with some postural limitations.  (Tr. 91-92).  Dr. Torello concurred with these findings.  (Tr. 120-21).

On January 11, 2013, Dr. Warren, a psychologist, indicated that Plaintiff had severe mental impairments, including anxiety and affective disorders as well as borderline intellectual functioning, and that she had moderate restrictions in activities of daily living and in the areas of concentration, persistence, and pace.  She thought Plaintiff could work in a relatively static environment with no strict time or production demands. (Tr. 88-89, 92-94).  Dr. Waggoner reached exactly the same conclusions.  (Tr. 117-18, 121-23).

### IV. The Medical Expert Testimony

Dr. Ronald Kendrick, a medical expert, was called to testify at the administrative hearing. His testimony begins at page 68 of the record.

Dr. Kendrick first identified the conditions which he believed to be documented in the medical records. Plaintiff had been treated for mild lumbar spondylolisthesis, and she also suffered from obesity. Additionally, she was treated for pain in the coccyx area, although there was no pathology associated with that. Dr. Kendrick said that there was no way objectively to verify her pain, although he agreed that her course of treatment was consistent with someone who had severe pain. He did not believe her conditions met the criteria for disability under the Listing of Impairments.

Asked to rate Plaintiff's functional capacity, Dr. Kendrick said that she could work somewhere between the light and sedentary level, being able to lift fifteen pounds occasionally and ten pounds frequently, to stand or walk for four hours in a workday, to sit for six, and to bend, stoop, kneel, and crawl only occasionally. She also needed to alternate between sitting and standing, being able to sit for 45 minutes to an hour and to stand for 30 minutes at a time.

V.  The Vocational Testimony

Dr. Walter Walsh was called to testify as a vocational expert at the administrative hearing. His testimony begins at page 74 of the administrative record.

Dr. Walsh was first asked some questions about someone with Plaintiff's background and who could work at the light exertional level, but who could only climb ladders, crawl, and stoop occasionally, and who could climb ramps and stairs, bend, and crouch frequently. He said that such a person could do 90% of the light unskilled jobs in the occupational base. If that person also could do simple one- to four-step tasks in a

relatively static environment without strict production demands, the percentage of light, unskilled jobs available would drop to 65 to 70 percent.  Examples would include cleaner, stock clerk, and packager.

Next, Dr. Walsh was asked to assume that Plaintiff had the limitations stated in Dr. Siefert's report - particularly a marked restriction in the performance of activities of daily living - and responded that work would be problematic for such a person.  Lastly, assuming that Plaintiff was limited in the way to which Dr. Kendrick testified, Dr. Walsh said that there would be sedentary jobs available, including security monitor, packager, and office clerk.

### VI. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 19-28 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2012.  Second, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including degenerative disc disease of the lumbar spine and obesity.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary level with these restrictions.  She could lift fifteen pounds occasionally and ten pounds frequently, stand or walk for four hours in a workday,

sit for six, and bend, stoop, kneel, and crawl only occasionally. She also needed to alternate between sitting and standing, being able to sit for 45 to 60 minutes at a time and to stand and walk for 30 minutes at a time.

Plaintiff had no past relevant work.  However, with the limitations on her work-related abilities which he found to exist, the ALJ determined that Plaintiff could do jobs like security monitor, packager, and officer clerk.  The ALJ further determined that these jobs existed in significant numbers in the state economy and the national economy.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

## VII.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises the following issues: (1) the ALJ improperly failed to give controlling weight or deference to the opinions of Dr. Siefert, a treating source; (2) the ALJ did not properly evaluate Plaintiff's credibility; (3) the ALJ improperly determined that Plaintiff's mental impairments were not severe; and (4) the ALJ failed to account for mental impairments throughout the sequential evaluation process.  The resolution of these issues is governed by the following standard of review.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435

(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Dr. Siefert's Opinion

As her first statement of error, Plaintiff asserts that the ALJ erred in giving only moderate weight to Dr. Siefert's opinion that Plaintiff's pain caused her to experience marked limitation in her activities of daily living. Citing to the familiar method of analysis for treating source opinions, Plaintiff argues that the ALJ neither found that Dr. Siefert's opinion was non well-supported by acceptable medical and diagnostic techniques nor concluded that it was inconsistent with the other evidence of record. Absent those findings, the ALJ should have, according to Plaintiff, given controlling weight to Dr. Siefert's opinion, and that would have resulted in a finding of disability.

The controlling regulation in this case is 20 C.F.R. §404.1527(c). As that regulation is explained in Blakley v. Comm'r of Social Security, 581 F.3d 399, 406 (6th Cir. 2009), that regulation contemplates a two-step analysis. First, the ALJ must determine if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and whether it is "inconsistent with the other substantial evidence"

-8-

in the administrative record.  See §404.1527(c)(2).  If not, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  Id. But these factors "are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight."  Gayheart v. Comm'r of Social Security, 710 F.3d 365, 376 (6th Cir. 2013).  This is not a hard and fast rule, however;  as the court observed in Aiello-Zak v. Comm'r of Social Security, 47 F.Supp.3d 550, 558 (N.D. Ohio 2014), "recent authority has held that so long as an ALJ adequately addresses the factors required by Gayheart and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the Gayheart template" (citing Dyer v. Social Security Administration, 568 Fed.Appx. 422, 425-26 (6th Cir. June 11, 2014)). See also Halama v. Comm'r of Social Security, 2013 WL 2013 WL 4784966, *7 (N.D. Ohio Sept. 5, 2013)(failure to follow exactly the Gayheart sequence of findings can be excused if the ALJ addresses "on the record each of the Gayheart elements so as to permit meaningful judicial review of the final decision").

    Here, the ALJ had this to say about Dr. Siefert's opinion:

> The opinion of W.L. Gregory Siefert, M.D., the claimant's treating physician, is given only moderate weight as it does not provide a medical source statement information about the nature, location, or quantitative statement of the claimant's pain since the alleged onset date.  Further, Dr. Siefert does not give a function-by-function assessment of the claimant's physical limitations, nor indicate what is meant by moderate to severe pain", (sic) in terms of various work activities, such as time length of sitting, standing, or walking, nor the amount of weight claimant

-9-

could still lift, despite her impairment.

(Tr. 26-27).  The Commissioner defends this articulation of the ALJ's reasoning process, asserting that Dr. Siefert's opinion was not a "medical opinion" which the ALJ was required to evaluate under §404.1527(c).

The major problem with this argument is, of course, that the ALJ did not provide this reasoning, and it would violate the articulation requirement of the  "treating physician" rule were the Court to accept an after-the-fact rationalization of the ALJ's conclusion.  <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 544 (6th Cir. 2004).  And even if the Court were to accept that argument, it is incorrect.  20 C.F.R. §404.1527(a)(2) says that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  Dr. Siefert's conclusion that, due to moderate to severe pain, Plaintiff was markedly limited in what she could do on a day-to-day basis fits comfortably within this definition. Further, the Commissioner does not attempt to argue that the ALJ's method of analysis comported with <u>Gayheart</u> and <u>Blakley</u>, and it is apparent from the language quoted above that it did not. The only question is whether the error is harmless.

The Commissioner contends that it is, based on the fact that the ALJ, when evaluating Plaintiff's activities of daily living in connection with the Listing of Impairments, determined that she had only a mild limitation in this area.  But the ALJ expressly disclaimed making a residual functional capacity analysis in that section of the decision ("[t]he limitations identified in the 'Paragraph B" criteria are not a residual functional capacity assessment ...").  (Tr. 23).  Further, as

-10-

Wilson teaches, it is hard to sustain the failure to follow the dictates of §404.1527(c) on harmless error grounds; a court may do so "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," but generally not otherwise.  Wilson, 378 F.3d at 547.  The fact that the ALJ has come to a conclusion that is inconsistent with the treating source's opinion cannot be the basis of a claim of harmless error, because that is true about every case where an ALJ has not given controlling weight to the treating physician's opinion.  The Commissioner has not demonstrated, or even argued, that no reasonable person could have credited Dr. Siefert's opinion about the extent to which Plaintiff was limited by her pain - a hard argument to make given the long-standing treating relationship.  Since error occurred, and it is not harmless, the case must be remanded on this ground.

### B.  The Credibility Analysis

Plaintiff's next argument is that the ALJ did not properly perform the required analysis of her credibility.  In support of this argument, she asserts that the reasons given by the ALJ for discounting her reports of disabling pain - her conservative treatment history, the success of treatment, and her part-time work activity - do not support his finding.  The Commissioner counters that the Court owes great deference to the ALJ's credibility determinations and that each reason given is a valid basis for refusing to credit fully Plaintiff's allegations.

Evaluation of a claimant's subjective reports of disabling pain is subject to a two-part analysis.  First, the Commissioner should determine if there is objective medical evidence which confirms the presence of disabling pain.  If not (and there frequently is not, given that pain is difficult to measure or quantify, and is experienced differently even by persons with the same underlying condition), the Commissioner should determine if the claimant suffers from an objectively-established medical

-11-

condition of sufficient severity to permit a reasonable inference to be drawn that the disabling pain actually exists. See Duncan v. Secretary of H.H.S., 801 F.2d 847, 853 (6th Cir. 1986). This procedure is reflected in 20 C.F.R. §404.1529(a).

It is important to note that these inquiries are to be made separately, and that if there is objective evidence of a sufficiently severe underlying condition, a claimant can prove the existence of disabling pain due to that condition through other evidence even if the medical evidence is not helpful in establishing the extent of the claimant's pain. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994). Thus, the Commissioner is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking, but must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. §404.1529(c)(3). The Commissioner should also give appropriate weight to the opinion of a long-term treating physician as to whether the claimant is accurately reporting or exaggerating the extent to which disabling symptoms exist. Felisky, 35 F.3d at 1040. If the Commissioner summarily rejects the claimant's testimony concerning pain without considering these matters, reversal or remand may be warranted.

Here, the ALJ articulated the proper analytical pathway and cited to, *inter alia*, Social Security Ruling 96-7p and to 20 C.F.R. §404.1529. He concluded that Plaintiff did have impairments which can cause symptoms but found that the extent of her symptoms were not documented in the medical evidence. Further, the ALJ found that her daily activities were not "limited to the extent one would expect" based on her complaints of pain, and said that her part-time work activity for three

years following her alleged onset date demonstrated abilities "somewhat greater than the claimant has generally reported at the time of her application and as reported at the hearing."  He also concluded that she was not particularly forthright in describing her work duties and that her treatment was no more than routine and conservative, as well as "generally successful in controlling those symptoms ...."  (Tr. 24-25).  Lastly, he pointed to gaps in treatment during which Plaintiff continued to work.  All of these factors led him to conclude that she had overstated the degree of pain she experienced.  (Tr. 26).

There are some clear flaws with this rationale.  Particularly as to the treatment history, it is hard to describe it either as routine and conservative or generally successful when Plaintiff was seen for five years by a pain management specialist, had multiple injections in her back, was recommended for radio frequency ablation because of the lack of success of other treatment modalities, was prescribed medications like Flexeril and Percocet, and never achieved more than a few weeks of relief from the injections she received.  Further, her description of her part-time work, which never rose to the level of substantial gainful activity, was that it became increasingly difficult for her to do, even on a very reduced schedule, and that she did receive accommodations due to pain.  By the time of the hearing, she had stopped working altogether, so it is difficult to see how her description of her limitations at the hearing was inconsistent with an allegation of disabling pain.  Given the fact that a substantial portion of the credibility analysis is not supported by a reasonable reading of the record, the ALJ should also revisit this issue on remand.

        C.   <u>Mental Residual Functional Capacity</u>

As her third statement of error, Plaintiff claims that the ALJ should have found her to suffer from one or more severe mental impairments, which was the conclusion reached by both state agency reviewing psychologists.  She argues that it was error for the ALJ to have given more weight to Mr. Sours'

evaluation, especially when the state agency reviewers had access to the entirety of the medical records and explained why Mr. Sours' conclusions were inconsistent with his own findings.  The Commissioner responds that this is simply an argument about the weight to be given to competing medical opinions and that the ALJ's decision on that issue is entitled to substantial deference.

In dealing with the opinion evidence as to mental impairments, the ALJ first briefly discussed the opinions of the state agency reviewers, concluding that their opinions deserved "little weight, because the evidence does not support a finding of severe mental impairments, as the claimant made very few psychiatric complaints and did not received (sic) mental treatment."  (Tr. 26).  The ALJ then discussed Mr. Sours' evaluation in more depth, noting that he had actually examined Plaintiff and that his opinion was consistent with the medical record.

As the Commissioner notes, the entire medical record about mental impairments appears to be limited to Mr. Sours' report.  The applicable regulation (again, §404.1527) suggests that, other things being equal, the opinion of an examining source is entitled to be given more weight than the opinion of a non-examining source.  Mr. Sours did find that Plaintiff suffered from borderline intellectual functioning and had less than marginal judgment, but he did not find a significant amount of impairment in any area of work-related functioning.  The state agency reviewers disagreed with him about Plaintiff's ability to perform more than 1-4 step tasks based on borderline intelligence, finding a limitation in the areas of carrying out detailed instructions, and also thought she needed to be in a relatively static work environment, but they did not explain why.  Given that the ALJ recognized a difference of opinion here and articulated why he chose one opinion over another, the Court finds no reversible error in the ALJ's conclusion that Plaintiff did not suffer from severe mental impairments.

D.  <u>Considering Mental Limitations</u>

Plaintiff next argues that even if she did not have a severe mental impairment, the ALJ nonetheless should have taken her nonsevere mental limitations into account in formulating her residual functional capacity.  She relies on the decision in <u>Simpson v. Comm'r of Social Security</u>, 344 Fed. Appx. 181 (6th Cir. Aug. 27, 2009), for support, contenting that it is error not to include the types of nonsevere limitations present in this case in the residual functional capacity analysis.  The Commissioner, in turn, argues that the evidence in <u>Simpson</u> supported far more serious mental limitations than those present here.

<u>Simpson</u> makes clear that an ALJ cannot simply equate the absence of a severe mental impairment with no mental limitations at all.  There, there was what the court described as "uncontradicted objective medical evidence" that the claimant suffered from limitations arising out of mental disorders.  <u>Id</u>. At 191.  Here, by contrast, the evidence is not as clear.  As noted, Mr. Sours did not find any work-related limitations at all, even as to the performance of multi-step tasks, despite some deficiencies in her intellectual functioning.  The ALJ was permitted to rely on his findings.  Further, unlike other cases where an ALJ fails to discuss mental impairments at all in connection with the residual functional capacity evaluation, <u>see, e.g., Hicks v. Comm'r of Social Security</u>, 2013 WL 3778947 (E.D. Mich. July 18, 2013), the ALJ did discuss the psychological opinion evidence as part of his discussion of residual functional capacity.  The Court finds no error here.

VIII.  <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

IX.  <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation,

-15-

that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

    The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                              /s/ Terence P. Kemp
                                              United States Magistrate Judge